**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1) JEFFREY ALLEN SIMMONS, as Personal Representative of THE ESTATE OF KYLE STEVEN SHAW,<br><br>Plaintiff,<br><br>v.<br><br>(2) OKLAHOMA COUNTY CRIMINAL JUSTICE AUTHORITY, *and*<br>(3) BOARD OF COUNTY COMMISSIONERS FOR OKLAHOMA COUNTY,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. ___CIV-23-859-HE___<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **COMPLAINT**

COMES NOW, Plaintiff Jeffrey Allen Simmons, Personal Representative and Administrator of the Estate of Kyle Steven Shaw, and for his causes of action against Defendants Oklahoma County Criminal Justice Authority, and the Board of County Commissioners of Oklahoma County, hereby states and asserts as follows:

### **PARTIES**

1. Plaintiff Jeffrey Allen Simmons ("Simmons") is a resident of Oklahoma County, and court-appointed Personal Representative and Administrator of the Estate of Kyle Steven Shaw (hereinafter, "Plaintiff" or the "Estate"). The Estate is currently undergoing probate in Oklahoma County, State of Oklahoma, Case No. PB-2023-955. *See* **Exhibit 1**, attached hereto (Order Appointing Administrator, *filed* August 29, 2023).

2.   Defendant Oklahoma County Criminal Justice Authority ("OCCJA") is a public trust created pursuant to the provisions of 60 Okla. Stat. § 176, *et seq.*, for the express purpose of "assisting" Oklahoma County in its stated objective of operating Oklahoma County "Jail Facilities," including (but not limited to) the Oklahoma County Detention Center (the "OK County Jail"). *See* Trust Indenture Creating OCCJA, *dated* June 10, 2019, *available at* https://oklahomacounty.legistar.com/LegislationDetail.aspx?ID=4215696&GUID=ABBA47B9-C73C-40FC-AC6A-CE27B4484389&Options=&Search= (last visited Sep. 26, 2023). Pursuant to the Trust Indenture, OCCJA began exclusively managing and operating the OK County Jail on or about June 1, 2020. Since that date, upon information and belief, OCCJA has maintained exclusive control and oversight over the management and operation of the OK County Jail. Members of the Oklahoma County Board of County Commissioners are permanent Trustees of OCCJA.

3.   Defendant Board of County Commissioners for Oklahoma County (the "Board") is a legislative entity with a non-delegable statutory duty to provide a jail for Oklahoma County that is adequate for the safe keeping of inmates. *See* 57 O.S. § 41. The Board, further, exercises the powers of Oklahoma County. *See* 19 O.S. §§ 3–4.

**JURISDICTION & VENUE**

4.   This Court has subject-matter jurisdiction over Plaintiff's claims, constitutional and statutory. *See* 28 U.S.C. §§ 1331, 1343.

5.   This Court may properly exercise supplemental jurisdiction over Plaintiff's tort claims, arising under Oklahoma law. *See* 28 U.S.C. § 1367(a).

6.   This Court has personal jurisdiction over each of the Parties.

7. Because the acts giving rise to the allegations raised herein occurred in Oklahoma County, State of Oklahoma, venue is proper in this Court. *See* 28 U.S.C. § 1391 ("A civil action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.").

## FACTUAL BACKGROUND

8. In May of 2021, the Oklahoma County Sheriff's Department detained Kyle Steven Shaw (hereinafter, "Kyle" or "Decedent") and sent the same to the OK County Jail.

9. Shortly thereafter, the Oklahoma County District Attorney's Office charged Kule with Assault and Battery with a Dangerous Weapon, in violation of 21 O.S. §§ 645, 652–53, and 681. *State v. Shaw*, Oklahoma County District Court, Case No. CF-2021-2061, *at* https://www.oscn.net/dockets/GetCaseInformation.aspx?db=oklahoma&number=CF-2021-2061&cmid=3977153 (last visited Sep. 25, 2023).

10. Months later, on February 13, 2022, OK County Jail personnel found Kyle lying unresponsive in his cell, at approximately 4:45am.

11. On that date, Kyle and his cellmate had volunteered to distribute breakfast trays. However, when the officer(s) intending to escort Kyle and his cellmate to the cafeteria arrived at Kyle's cell, only Kyle's cellmate emerged.

12. It took the officer(s) some minutes to realize Kyle was lying inside his cell and, by that time, completely unresponsive.

13. Without ever having faced a jury with respect to the charges described in ¶ 9 above, Kyle died in his cell.

14. On or about February 14, 2022, the Office of the Chief Medical Examiner conducted an autopsy on Kyle's body and issued a report. The report by the Chief Medical Examiner stated: "the death of Mr. Kyle Shaw was caused by fentanyl intoxication."

15. It is unclear, at this point, how Kyle came into contact with fentanyl, including whether such contact was voluntary or involuntary.

16. Responding to media reports of Kyle's death, Oklahoma County Jail Administrator Greg Williams ("Williams") commented: "[W]hile we await the medical examiner's report to know for certain the facts around this death, we acknowledge contraband and illegal narcotics are a problem in jails and prisons all over the country."

17. Williams, elaborating on these comments, admitted and acknowledged that OK County Jail Policies and Procedures aimed at keeping lethal narcotics, like fentanyl, out of the same were insufficient. Williams also mentioned new protocols, intended to be put in place by March of 2022—just one month after Kyle's preventable demise.

18. Upon information and belief, one or more employees of the OK County Jail has been charged, accused, or otherwise found to have smuggled narcotics, like fentanyl, into the OK County Jail.

19. As an example, on or about May 11, 2022, an OK County Jail employee, China Tucker ("Tucker"), was arrested and accused of smuggling narcotics into the OK County Jail. Media reports documenting Tucker's arrest detail that: "investigators found a cell phone inside the cell of" an inmate and, therein, "found contact information for [] [] China Tucker . . . as well as photos of a potential narcotics drop that happened on April 29, 2022." Those same reports also state: on or immediately preceding the date of Tucker's arrest,

"[i]nvestigators said they found fentanyl . . . ready to be smuggled into the jail" in Tucker's vehicle. *See* "Oklahoma County Detention Center employee accused of smuggling contraband into jail," KOKH/OKC Fox 25, *available at* https://okcfox.com/news/local/china-tucker-oklahoma-county-detention-center-smuggling-contraband-artis-dixon-jail-arrest-chevrolet-tahoe-backwoods-cigars-cell-phones-cigarettes-meth-marijuana-fentanyl (last visited Sep. 5, 2023). Tucker's arrest is not an outlier—it is just one example of OK County Jail employees secretly importing drugs—like fentanyl—into the OK County Jail, to the determinant of the health and safety of Oklahoma County pre-trial detainees and other inmates.

20.  On March 23, 2023, a Multicounty Grand Jury issued a <u>Final Report Regarding Oklahoma County Criminal Justice Authority and the Administration of the Oklahoma County Detention Center</u> (the "Report"), *available at* https://nondoc.com/wp-content/uploads/2021/11/NIC-Reports.pdf (last visited Sep. 26, 2023).

21.  In its Report, the Multicounty Grand Jury made numerous findings relevant herein, including the following:

   a.  "[O]ne of the most significant design flaws within the jail is its cinderblock construction and the ease in which inmates can break through the walls, including the external walls. . . . Testimony was also developed that inmates routinely break holes in the external walls of the jail and use 'line' to lower down the side of the building, where individuals will provide drugs and contraband that can be pulled back into the cell."

   b.  "Since the 'Trust' has been in place, 37 inmates have died or became ill and died in the jail since July 1, 2020. Each inmate death is different and tragic, but many of the deaths were preventable."

    c.    Two of the three "major issues" leading to deaths in the OK County Jail include (1) "inadequate controlled dangerous substance interdiction" and (2) "the failure of detention officers to conduct proper site checks on inmates."

    d.    "While the possession and use of controlled dangerous substances is not as uncommon as it should be within a detention facility, the predominance of opioids within OCDC is horrific."

    e.    "Illegal drugs are entirely too common in the jail."

    f.    "Questions remain as to whether staffing levels have been adequate for conducting the necessary site checks. These site checks, required under jail regulations, have not been adequate and falsified site checks have led to deaths in the jail."

    g.    "[M]any inmates have significant addiction issues and controlled dangerous substances seem to be readily available within the closed environment."

    h.    "The jury believes that employees in the past, and possible some current employees, have a 'vested interest' in aiding the import of drugs into the jail. The jury has also learned that background checks have been limited . . . and members of organized criminal gangs have been able to secure employment as detention officers and have aided in the introduction and distribution of controlled substances in the jail, leading to loss of life[.]"

    i.    "[A]ccording to testimony of witnesses, administrative staff were warned and allegedly ignored concerns by some investigative staff that criminal street gang members were being hired as detention officers."

    j.    "[T]here are serious concerns with the possession, distribution, and consumption of controlled dangerous substances in the jail."

    k.    "Drug overdoses within the jail were [] not investigated as homicides. In fact, jail investigators were unaware that the distribution of a controlled substance that causes death was a potential felony murder charge."

22.    As the Report details, the OK County Jail, its operators, and its staff, maintained a problematic culture of deliberate indifference to the danger posed by controlled substances entering the OK County Jail—a problem only exacerbated by outrageously shoddy hiring

practices, little to no oversight of inmates by OK County Jail employees, poor training, and a crumbling facility.

23. OK County Jail operators, employees, staff, and other stakeholders—including Defendants, the entities responsible for management and oversight of the same—knew of the clear and present, potentially lethal danger posed by opioids—like fentanyl—to detainees in the OK County Jail. But OK County Jail operators, employees, staff, and other stakeholders—*for years*—did *nothing* to reasonably address this danger.

24. Due to the failures of OK County Jail employees, staff, and other stakeholders (including Defendants), Kyle lost his life—after spending almost a full year in pre-trail detention, in the OK County Jail.

25. Compounding the tragedy of Kyle's death, there is no indication that any jail personnel, employee, or staff used—or even attempted to use—lifesaving Narcan on Kyle at or immediately after the moment he was discovered.

26. The Eighth and Fourteenth Amendments to the United States Constitution require that inmates, detainees, and the like be held in safe, reasonably adequate conditions of confinement. Any employee of the OK County Jail knew or reasonably should have known of this requirement at the time of the conduct complained of herein, as such rights were clearly established.

27. With deliberate indifference, Defendants failed to protect Kyle from the preventable proliferation of lethal opioids—like fentanyl—in the OK County Jail or to otherwise act to save Kyle after finding him unresponsive in his cell.

28. Defendants and OK County Jail personnel, employees, and staff disregarded the known, obvious, and excessive risks of harm to Kyle posed by opioids entering the OK County Jail.

### Oklahoma County Policies & Procedures Contributing to Kyle's Death

29. There is an affirmative link between Kyle's preventable death and the poor policies, practices, and customs promulgated by Defendants or otherwise pervading the cells of the OK County Jail.

30. Since its inception and creation over thirty (30) years ago, the OK County Jail has suffered from a plague of well-publicized issues and concerns, including overcrowding; understaffing; inadequate security and supervision of detainees and inmates; repeated instances of excessive use of force by staff—the list goes on and on.

31. Illustrating as much, following an in-depth, lengthy investigation in 2008, the U.S. Department of Justice ("DOJ") issued a report on conditions of confinement at the OK County Jail. The DOJ found woefully inadequate supervision and staffing at the OK County Jail, a lack of basic medical and mental health care, overcrowding, and—pertinent here—a high rate of inmate deaths.

32. Defendants were on notice of and otherwise knew of the constitutional deficiencies addressed in the DOJ's report.

33. Upon information and belief, a shortage of staff, exacerbated by outrageously lax and poor hiring practices, has contributed to a lack of control over the proliferation of drugs in the OK County Jail.

34. Upon information and belief, due to the well-known, repeatedly documented risk and dangers apparently inherent to the Defendant Board's operation of the OK County Jail, including the consistently poor provision of supervision and low-quality hiring practices, Defendant Board previously entered into a Memorandum of Understanding with the DOJ.

35. Upon information and belief, this Memorandum of Understanding required Defendant Board to adequately fund and staff the OK County Jail by a date certain, lest the Board risk court action from the federal government to force compliance.

36. As of February 13, 2022, and as evidenced by Kyle's preventable death, Defendant Board had not complied with the terms of any Memorandum of Understanding reached with the DOJ.

37. From at least 2008 to present, a chronic shortage of detention officers coupled with the flawed design of the OK County Jail facility have contributed to the proliferation of drugs, like fentanyl, among detains within the OK County Jail system.

38. Due to a lack of adequate staffing, overcrowding of detainees, and an overall attitude of indifference toward detainee/inmate safety, drug addiction, and the risks to health posed by the proliferation of black-market drugs in the confines of the OK County Jail, the use, sale, and transfer of drugs within the OK County Jail is commonplace—or at least, much more common than in other detention facilities of like size and character.

39. In June of 2021, the National Institute of Corrections transmitted a seventy (70) page report detailing deficiencies in the operation and maintenance of the OK County Jail to Defendants and/or other Parties interested in the same (the "NIC Report"). *See* Matt Peterson, "Reports on 'disturbing' Oklahoma County Jail contradict improvement claims,"

NONDOC MEDIA, *available at* https://nondoc.com/2021/11/15/new-reports-on-disturbing-oklahoma-county-jail/ (last visited Sep. 25, 2023).

40. The NIC Report details significant problems within the OK County Jail facility, including (but not limited to):

    a. Unsafe, "disturbing" conditions in OK County Jail Housing Units, including the presence of "holes made in [] cell walls large enough to allow inmates to move without restriction from cell to cell in a line inside pods" and "broken windows everywhere";

    b. "[Q]uick hiring without proper background checks," leading to the hiring of "unqualified people, including gang members" and otherwise contributing to the ongoing, chronic staff shortage;

    c. "[S]ignificant safety and security concern[s]" brough upon by understaffing;

    d. "[N]o real checkpoint for staff, contractors, and volunteers entering the jail," which allowed for risks like "[p]ersons [] entering the jail with back packs unchecked"; *and*

    e. "**[I]nmate safety and jail security is in constant jeopardy**."

41. During the visit(s) to the OK County Jail conducted by NIC (and predating the NIC Report), Rollin Cook (a contributor to the NIC Report) observed that "[c]ontraband control was expressed as a concern by all staff interviewed and was actually easily confirmed from walking around and observing housing units and cells." Rollin Cook also reported: "[T]here seemed too little attention to security due to complacency, in general, leading to conclusions that security and safety is in constant jeopardy."

42. Defendants plainly failed to adequately train and supervise OK County Jail personnel, officers, and staff, in violation of the Oklahoma Jail Standards, with respect to, *inter alia*, OK County Jail personnel's failures to: protect detainees/inmates, provide

adequate medical care to injured detainees/inmates; correct knowingly cruel and/or inhumane detainment and corrections practices; *and* adhere to constitutional requirements governing conditions of confinement.

43. Here, Defendants nonenforcement of necessary Policies and Procedures, failure to otherwise address omnipresent, dangerous issues plaguing the OK County Jail *for years*, and "hands-off" approach to jail management caused or at least contributed to Kyle's preventable death.

44. Defendants, over these past several years, have had opportunity after opportunity to increase funding to the OK County Jail, improve the hiring, training, and supervision of OK County Jail personnel, officers, and other staff, and otherwise address the systemic deficiencies which have plagued the OK County Jail since its creation.  Defendants' failures to take advantage of these opportunities has resulted numerous injuries and unnecessary deaths—including the death of Kyle.

45. Defendants' failure to implement reasonable measures intended to alleviate known and substantial risks to detainees/inmates posed by drugs, the proliferation of drugs, or detainee/inmate addiction and usage, constitutes deliberate indifference at the municipal level.

46. On or about December 30, 2022, Ryan Kiesel, Counsel for Plaintiff, contacted Defendant OCCJA with a Letter and Open Records Request, seeking certain items of information and evidence from the same. *See* **Exhibit 2**, attached hereto (Letter, *dated* Dec. 30, 2022).  In making this request, Counsel explicitly asked OCCJA to "preserve, retain, and not destroy all evidence pertaining to this incident, including video footage[.]"

47. To date, the items requested by Plaintiff's Counsel in the December 30, 2022, Letter and Records Request have not been produced by OCCJA or otherwise received by Plaintiff.

48. On February 14, 2023, the undersigned Counsel, on behalf of Simmons, Kyle's sister, Angela McIntyre ("McIntyre"), and the Estate, provided Defendants—*via* email, hand delivery, and delivery to the Oklahoma County Clerk—a Letter notifying the same of Simmons' and McIntyre's intentions to bring tort claims arising from Kyle's untimely death.

49. In that same Letter, the undersigned Counsel requested specific items of evidence supporting Plaintiff's actual or potential tort claims, including canteen records, training records of employees at the OK County Jail, information about and concerning Kyle's cellmate(s), and other critical information or evidence.

50. To date, Plaintiff has not received any response to the Letter dated February 14, 2023.

**FIRST CAUSES OF ACTION**
VIOLATIONS OF AMEND. VIII AND XIV TO THE U.S. CONSTITUTION
(42 U.S.C. § 1983)

51. Plaintiff hereby reincorporates and adopts by reference ¶¶ 1–50 above, as if fully restated herein.

52. Defendants subjected Kyle or otherwise caused Kyle to be subjected to a deprivation of rights, privileges, and immunities secured by the Constitution of the United States, which requires the provision of adequate medical care and otherwise balks at the denial of equal protection under the laws.

53. Defendants violated Kyle's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

    A.    DEFENDANTS VIOLATED KYLE'S RIGHT TO ADEQUATE CONDITIONS OF CONFINEMENT BY EXPOSING KYLE TO A KNOWN, UNREASONABLE RISK OF DRUG-INDUCED HARM.

54. Plaintiff hereby reincorporates and adopts by reference ¶¶ 1–53 above, as if fully restated herein.

55. At the time of the events, actions, and omissions described herein, Plaintiff retained a clearly established constitutional right to adequate conditions of confinement.

56. "Contraband control" and the right to be protected from violence deriving from the use, trade, and proliferation of drugs—is part and parcel with Plaintiff's constitutional right to adequate conditions of confinement.

57. At all times pertinent herein, Defendants subjected Plaintiff—a pre-trial detainee—to a drug-laden environment reinforced by OK County Jail policies, procedures, and norms, including the lax, "hands-off" practices of OK County Jail employees, staff, and other personnel in supervising detainees/inmates; ineffective screening of new employees (pre-hiring); and lack of control and screening of entrants to the OK County Jail facility.

58. Defendants' maintenance of the drug-laden environment and enabling of the drug trade within the cells of the OK County Jail—including, upon information and belief, by OK County Jail personnel—caused or contributed to Plaintiff's death and, in this way, caused violence to Plaintiff.

59. Any reasonable OK County Jail staff member, officer, or other employee knew or should have known of Plaintiff's right to adequate conditions of confinement at the time of the events complained of herein, as the same are clearly established.

60. Defendants had actual knowledge, or it was obvious, that Plaintiff's prolonged, pre-trial detainment placed him at substantial risk of violence, injury, or death resulting from the uncontrolled proliferation, distribution, and sale of contraband—including fentanyl—in the OK County Jail facility.

61. With deliberate indifference, Defendants failed to protect Kyle from a known risk of harm and disregarded the known, obvious, and excessive risks posed to Kyle by the OK County Jail facility's inadequacies and the repeated, years-long failings of its staff.

62. As a direct and proximate result of Defendants' unlawful conduct, Kyle suffered the ultimate injury: premature, preventable death.

> B. DEFENDANTS VIOLATED KYLE'S RIGHT TO ADEQUATE MEDICAL CARE BY *BOTH* CREATING THE DANGER WHICH LATER KILLED KYLE AND, UPON KYLE'S EXPOSURE TO THAT DANGER, FAILING TO PROVIDE ADEQUATE, POTENTIALLY LIFE-SAVING MEDICAL CARE.

63. Plaintiff hereby reincorporates and adopts by reference ¶¶ 1–62 above, as if fully restated herein.

64. Kyle, like all detainees and inmates, retained a constitutional right to adequate medical care during the period of his detainment/incarceration.

65. The OK County Jail operators, officers, and other employees created and fostered an environment in which deadly drugs—including fentanyl—proliferated among detainees

and were otherwise openly used, distributed, bought, and sold among the OK County Jail populace—including among OK County Jail staff and personnel.

66. On February 13, 2022, Kyle—whether intentionally or accidentally—came into contact with fentanyl proliferated, distributed, and sold through the OK County Jail.

67. After coming into contact with fentanyl, Kyle required immediate, emergency medical attention, including the deployment of Narcan *a/k/a* Naloxone.

68. By failing to timely obtain medical attention for Kyle, including by failing to obtain and deploy Narcan, OK County Jail staff, officers, and personnel acted with deliberate indifference to Kyle's serious medical needs.

69. The failure by OK County Jail staff and personnel to obtain and deploy Narcan—a potentially life-saving formula in response to fentanyl exposure—was a direct, proximate cause of Kyle's death.

70. The failure by OK County Jail to maintain a working phone system to be used by detainees/inmates in the event of emergency or otherwise enable the emergency communication between OK County Jail staff and detainees/inmates may have also contributed to or caused Kyle's death.

   C. On These Facts, Defendants Are Subject to Municipal Liability.

71. Plaintiff hereby reincorporates and adopts by reference ¶¶ 1–70 above, as if fully restated herein.

72. The acts of OK County Jail staff, employees, and personnel, described herein, are causally connected and otherwise part and parcel with the well-known customs, practices, and policies of the OK County Jail, which Defendants promulgated, created, implemented

and/or possessed responsibility therefor. These customs, practices, and/or policies are outlined in ¶¶ 26–42 herein.

73. Defendants knew or should have known—or at least, it was obvious under the circumstances—that by maintaining the customs, practices, and policies described herein, Defendants were placing detainees, like Kyle, at an unreasonable and substantial risk of harm. Nevertheless, Defendants failed to take reasonable measure to alleviate such risk.

74. Defendants—by failing to undertake remedial measures or otherwise fashion a reasonable response to the years-long failures of the OK County Jail, its operators, and its personnel—have acted with deliberate indifference to the health, welfare, and safety of *all* persons in Oklahoma County, including Kyle.

75. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Kyle suffered the ultimate injury: untimely, unexpected death.

76. Defendants and the OK County Jail personnel, officers, staff, and operators, at all times pertinent herein, acted with reckless disregard for Kyle's rights or otherwise acted intentionally and with malice towards Kyle.

77. As a result of the Defendants' acts and/or failures to act, Plaintiff has suffered damages and, accordingly, should be awarded an amount exceeding $75,000.00, as well as any other remedy or redress requested herein or to which Plaintiff is otherwise entitled as a matter of law and equity.

## SECOND CAUSES OF ACTION
### NEGLIGENCE

78.  Plaintiff hereby reincorporates and adopts by reference ¶¶ 1–77 above, as if fully restated herein.

79.  Defendants owed Kyle a variety of duties, including a general duty to protect Kyle from foreseeable risks of harm (*i.e.*, death) arising from a known or reasonably knowable hazard with Defendants' control (*i.e.*, the uncontrolled proliferation of fentanyl and other contraband within OK County Jail).

80.  Defendants owed other duties, including (but not limited to):

   a.  a duty to detain or house Kyle in a jail adequate for the "safekeeping of prisoners lawfully committed," 57 O.S. § 41; *see also* 74 O.S. § 192 (establishing standards for inspection of city and county jails);

   b.  a duty to maintain the OK County Jail in "suitable" condition for the housing of inmates, including by maintaining a safe facility free from the uncontrolled proliferation of fentanyl and other drugs, *see* 74 O.S. § 192 (establishing standards for inspection of city and county jails)

   c.  a duty to provide adequate medical care or otherwise ensure the availability of the same, *see, e.g.*, 57 O.S. § 51 (vesting County Commissioners with duty to provide suitable means for maintaining a jail facility and power to appoint a "medical officer"), 74 O.S. § 192(A)(9) (providing "adequate medical care" as a standard to be used in inspection);

   d.  a duty to train employees and staff adequately, 74 O.S. § 192(A)(7); *and*

   e.  and to advise detainees/inmates of the "rules of the facility in which they are detained, *id.* § 192(A)(6).

81. By the acts and omissions described herein, which resulted in Kyle's death from an unanticipated, preventable fentanyl overdoes, Defendants breached the foregoing duties.

82. Defendants' acts and omissions, as described herein, directly and proximately caused Kyle's death.

83. Defendants and the OK County Jail personnel, officers, staff, and operators, at all times pertinent herein, acted with reckless disregard for Kyle's rights or otherwise acted intentionally and with malice towards Kyle.

84. As a result of the Defendants' acts and/or failures to act, Plaintiff has suffered damages in an amount exceeding $75,000.00, and as otherwise described herein.

### THIRD CAUSES OF ACTION
WRONGFUL DEATH

85. Plaintiff hereby reincorporates and adopts by reference ¶¶ 1–82 above, as if fully restated herein.

86. By the acts and omissions described herein, the staff, officers, and operators of the OK County Jail—including Defendants, who manage and oversee the OK County Jail—wrongfully and tortiously caused Kyle's the ultimate injury or damage: preventable death.

87. As a result of Kyle's death, his family members have suffered grief and shock, pain and suffering, and the loss of companionship with their sibling, and otherwise incurred costs associated with his burial.

88. Defendants and the OK County Jail personnel, officers, staff, and operators, at all times pertinent herein, acted with reckless disregard for Kyle's rights or otherwise acted intentionally and with malice towards Kyle.

89. As a result of the Defendants' acts and/or failures to act, Plaintiff has suffered damages and, accordingly, should be awarded an amount exceeding $75,000.00, as well as any other remedy or redress requested herein or to which Plaintiff is otherwise entitled as a matter of law and equity.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant him the relief sought herein, including but not limited to actual and compensatory damages in excess of seventy-five thousand dollars ($75,000.00), with interest accruing from the date of filing suit, punitive damages for Defendants' reckless disregard of Kyle's clearly established rights, the costs of bringing this action, a reasonable attorneys' fee, along with any such other relief as is deemed just and equitable.

Respectfully Submitted,

s/ Wyatt McGuire
J. Blake Johnson, OBA No. 32433
Ryan Kiesel, OBA No. 21254
Wyatt McGuire, OBA No. 34720
OVERMAN LEGAL GROUP, PLLC
809 NW 36th Street
Oklahoma City, Oklahoma 73118
Telephone:   (405) 605-6718
Facsimile:   (405) 605-6719
Email:       blakejohnson@overmanlegal.com
             ryan@rkoklaw.com
             wyattmcguire@overmanlegal.com

*– and –*

Ryan Kiesel, OBA No. 21254
Ryan Kiesel, Attorney at Law, PLLC
3022 NW 39th Street
Oklahoma City, Oklahoma 73157
Telephone:   (405) 303-1215
Email:       ryan@rkoklaw.com
**ATTORNEYS FOR PLAINTIFF**

**ATTORNEY LIEN CLAIMED**
**JURY TRIAL DEMANDED**

20